IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| IN RE NII HOLDINGS, INC. SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)  1:14-CV-227(LMB/JFA)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Lead Plaintiffs seek to certify a nationwide class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3)

composed of "[a]ll persons and entities that, during the period from February 25, 2010 through

February 27, 2014, inclusive, purchased or otherwise acquired the publicly traded securities of NII

Holdings, Inc. ("NII Holdings") and/or NII Capital Corp. ("NII Capital", [sic] together with NII

Holdings, "NII" or the "Company") and who were damaged thereby." Pls.' Mem. in Supp. of Lead

Pls.' Mot. for Class Cert. and Appoint. of Class Reps. and Class Counsel at 1 [Dkt. No. 200], Sept.

11, 2015 ("Pls.' Mem."). Lead Plaintiffs request that this class include all persons and entities that

transacted in NII common stock and three different NII bonds, a 10% Note, an 8.875% Note, and a

7.625% Note. Id. Lead Plaintiffs also seek the appointment of Lead Plaintiffs as Class

representatives. Id. Finally, Lead Plaintiffs seek the appointment of Labaton Sucharow LLP

("Labaton") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") as Co-Class Counsel

and Susan R. Podolsky as Class Liaison Counsel. Id. For the reasons that follow, this motion will

be granted.

## I. BACKGROUND

This action arises out of a strategic business shift undertaken by NII Holdings, Inc., which

is a telecommunications company headquartered in Virginia. NII offered wireless voice and data services through its Nextel-branded subsidiaries in Brazil, Mexico, Argentina, Chile, and Peru. Defs.' Mem. in Opp'n to Lead Pls.' Mot. for Class Cert. and Appoint. of Class Reps. and Counsel at 3 [Dkt. No. 210], Oct. 2, 2015 ("Defs.' Opp'n"). Beginning in 2009, NII started to transition its cellular networks in the above-mentioned countries from second-generation ("2G") technology to third-generation ("3G") technology. Pls.' Mem. at 3.

Lead Plaintiffs, all of which are large pension funds, brought this action against NII and three current and former NII officers—Steven Dussek, who was Chief Executive Officer until December 2012; Steven Shindler, who was Chief Executive Officer after December 2012; and Gokul Hemmady, who was Chief Financial Officer until October 2012 and Chief Operating Officer after June 2012, continuing in that position until the end of the class period. Id. On September 15, 2014, NII filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York and received court approval of its bankruptcy plan in June 2015. Pls.' Mem. at 2 n.3. Due to the bankruptcy, all claims against NII have been extinguished, leaving only the individual NII officers as defendants in this civil action which charges them in two counts with violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 and with "control person" liability under § 20(a) of the Securities Exchange Act of 1934. Id. These counts are premised on allegations that defendants "engaged in a pattern of lies and half-truths concerning the progress and efficacy of NII's 3G transition, the quality of its customer base, and the company's ability to generate and maintain positive subscriber growth metrics." Pls.' Mem. at 3-4.

II. DISCUSSION

A. **STANDARD OF REVIEW**

It is axiomatic that plaintiffs, as the parties seeking class certification, have the burden of proving that all class certification requirements are met. Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2551 (2011); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). In the Fourth Circuit, plaintiffs must "establish by a preponderance of the evidence that the action complies with each part of Rule 23." Brown v. Nucor Corp., 785 F.3d 895, 931 (4th Cir. 2015). Lead Plaintiffs therefore bear the burden of demonstrating (1) that the class is so numerous that the joinder of all members would be impracticable; (2) that questions of law or fact are common to the class; (3) that their claims or defenses are typical of those of the class; and (4) that they will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Apart from these Rule 23(a) requirements, plaintiffs must also demonstrate that the requirements of Rule 23(b)(3) are met—namely, that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Importantly, as the Supreme Court recently reiterated, the Court must perform a "rigorous analysis" to determine whether the party seeking class certification has borne the burden of establishing that it satisfies the certification requirements. Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013) (quoting Wal-Mart, 131 S. Ct. at 2551). The Supreme Court has further advised that "sometimes it may be necessary for [lower courts] to probe behind the pleadings before coming to rest on the certification question" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id. (quoting Wal-Mart, 131 S. Ct. at 2551 (internal quotation marks omitted)). Such an analysis is appropriate to ensure that class actions remain "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v.

Yamasaki, 442 U.S. 682, 700-01 (1979).

### B. **RULE 23(A)**

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). Defendants do not dispute that Lead Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a); instead, their challenge to certification principally centers on Lead Plaintiffs' showing of market efficiency as it relates to the finding of predominance required by Fed. R. Civ. P. 23(b)(3). Nevertheless, this Court must still undertake a "rigorous analysis" to ensure that plaintiffs have carried their burden of satisfying both Fed. R. Civ. P. 23(a) and (b) by a preponderance of the evidence. See Comcast, 133 S.Ct. at 1432.

### 1. Numerosity

Lead Plaintiffs must show that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although neither the Federal *Rules* nor the federal courts have identified a particular threshold, classes as small as "twenty-five or more" have been certified. See, e.g., Talbott v. GC Servs., 191 F.R.D. 99, 102 (W.D. Va. 2000); see also Holsey v. Armour & Co., 743 F.2d 199, 217 (4th Cir. 1984) (finding between 46 and 60 members sufficient). As Lead Plaintiffs point out, numerosity is rarely disputed in securities fraud class actions, and this class action is no different. Pls.' Mem. at 5-6. During the class period, between 166 million and 173 million shares of NII stock were outstanding and more than $2 billion in NII Bonds were outstanding as of February 21, 2014. Id. at 6. On average, 42.4% of the bonds were held by non-institutional investors. Id. These statistics give rise to a strong inference that class membership is so numerous that joinder would be impracticable. Accordingly, this element is

4

easily satisfied.

2. Commonality

Lead Plaintiffs must next show that "there are questions of law or fact common to the [proposed] class." Fed. R. Civ. P. 23(a)(2). Commonality focuses on the relationship class members have to each other qualitatively, not quantitatively. Although commonality requires only the presence of a single common question, not just any common question will do. Instead, a plaintiff must "demonstrate that the class members have suffered the same injury[,]" Wal-Mart, 131 S. Ct. at 2551 (internal quotation marks and citation omitted), which is a shared injury dependent upon a "common contention." Id. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. In other words, a plaintiff must demonstrate that a classwide proceeding has the capacity "to generate common answers apt to drive the resolution of the litigation." Id. To this end, the commonality inquiry tends to merge into the typicality inquiry.

Lead Plaintiffs provide a non-exhaustive list of five questions of fact and law common to all members of the proposed class.

- whether defendants' alleged acts and omissions violated the federal securities laws;
- whether defendants disseminated any public statements during the class period that contained material misrepresentations or omitted material facts;
- whether defendants acted knowingly, or with reckless disregard, in misrepresenting or omitting those material facts;
- whether the market prices of NII Stock and NII Bonds were artificially inflated during the class period as a result of the misrepresentations or omitted material facts; and
- whether Lead Plaintiffs and other members of the class suffered damages, as well as the appropriate measure thereof.

Pls.' Mem. at 7. As was the case in In re NeuStar, Inc. Securities Litigation, No. 1:14-CV-885, 2015 WL 5674798, at *6 (E.D.Va. Sept. 23, 2015), "the questions of whether Defendants'

statements or omissions were material, whether they were made in connection with the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof." Id. (internal quotation marks omitted). Accordingly, this requirement is also satisfied.

        3.  Typicality

     A plaintiff must also show that its "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is designed to ensure that the class representative's interests are sufficiently aligned with those of the other class members, and it is therefore "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001); see also Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006); James v. City of Dallas, Tex., 254 F.3d 551, 571 (5th Cir. 2001). "Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 (4th Cir. 2001) (quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982)). Put simply, a Lead Plaintiff must demonstrate that it has claims that are of the same sort as other members of the proposed class.

     Lead Plaintiffs contend that they satisfy the typicality requirement because like other members of the proposed Class, they seek to recover damages for losses caused by the same materially false and misleading statements and omissions allegedly disseminated by defendants. Pls.' Mem. at 8. They aver that collectively Lead Plaintiffs incurred losses of more than $15 million with respect to their NII securities holdings. Id. at 9. As Lead Plaintiffs point out, the

named plaintiffs are typical of the class because they too seek to recover damages for losses caused by the same allegedly materially false and misleading statements and omissions. Id. at 8. As a result, as Lead Plaintiffs correctly argue, "as goes the claim of the named plaintiff, so go the claims of the class." Id. at 9. (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998) (internal quotation marks omitted)). As such, Lead Plaintiffs have satisfied the typicality requirement.

### 4.  Adequacy of Representation

Lastly, a plaintiff must show that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation marks omitted). The adequacy requirement is designed to detect and avoid potential conflicts between the class representative and other class members. See Amchem, 521 U.S. at 625-26. Potential conflicts between the class representative and class members include "differences in the type of relief sought, especially retrospective versus prospective relief." Id. In other words, the class representative's interest in prosecuting its own case must simultaneously tend to advance the interests of the other class members. Id. at 626 n.20. Notably, this Court has already determined that under the Private Securities Litigation Reform Act ("PLSRA"), 15 U.S.C. § 78u-4, Lead Plaintiffs, Co-Class Counsel, and Class Liaison Counsel were adequate. See Order for Appointment of Lead Plaintiff and Approval of Selection of Counsel [Dkt. No. 101], Jun. 10, 2014.

As Lead Plaintiffs demonstrate, their interests are aligned with the interests of absent class members, thereby suggesting their adequacy as class representatives. Pls.' Mem. at 10. The Lead Plaintiffs are all sizeable pension funds that have a strong incentive to seek the largest possible

7

recovery on behalf of their beneficiaries. Id. at 10-11. Although defendants half-heartedly dispute Lead Plaintiffs' adequacy in the Statement of Facts portion of their Opposition—describing Lead Plaintiffs as "differently situated with respect to each of the alleged materialized risk events and corrective disclosures," Defs.' Opp'n. at 4—that argument does not rebut the strong evidence demonstrating that Lead Plaintiffs' interests are aligned with those of the putative class in terms of establishing defendants' liability and obtaining the maximum possible recovery. Pls.' Mem. at 10. Lead Plaintiffs have also put forth evidence that these pension funds are committed to working cohesively as a group to prosecute the action, and all of the Lead Plaintiffs have filed certifications attesting that they would competently fulfill their role as Class Representatives. Id. Taken as a whole, Lead Plaintiffs have demonstrated by a preponderance of the evidence that they would satisfy the requirement of adequate representation.

In terms of the adequacy of proposed class counsel, Rule 23(g)(1)(A) dictates that a court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's work experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Defendants do not dispute that proposed Co-Class Counsel and Class Liaison Counsel are highly experienced in litigating these types of actions and have a proven track record in prosecuting complex securities actions. Pls.' Mem. at 12. Moreover, proposed Co-Class Counsel and Class Liaison Counsel have already undertaken substantial work in identifying, investigating, and initiating this action, which further suggests their adequacy. Id. Accordingly, Lead Plaintiffs, Co-Class Counsel, and Class Liaison Counsel have made the requisite showing that they would adequately represent the interests of absent class members.

### C. **RULE 23(B)(3)**

In addition to satisfying the prerequisites of Rule 23(a), the representative of a proposed class also bears the burden of satisfying the requirements of one of the three Rule 23(b) categories. In this case, Lead Plaintiffs have requested "opt-out class" certification under Rule 23(b)(3), which requires the Court to find (1) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

 1. Predominance

Rule 23(b)(3)'s predominance requirement is similar in focus albeit "far more demanding" than Rule 23(a)'s commonality requirement. Amchem, 521 U.S. at 624. The purpose of the heightened standard is to test whether the proposed class "is sufficiently cohesive to warrant adjudication by representation." Id. at 623-24. For this reason, courts must concentrate on the issue of liability rather than damages, "and if the liability issue is common to the class, common questions are held to predominate over individual ones," In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 542 (E.D. Va. 2006); however, if resolution of the liability issue "turns on a consideration of the individual circumstances of each class member," certification under Rule 23(b)(3) is inappropriate. Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006). In addition, fraud cases like this one are particularly appropriate candidates for treatment under Rule 23(b)(3) given that the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases. Amchem, 521 U.S. at 591.

A standard element of all fraud claims is that a plaintiff reasonably relied on the alleged

misrepresentation or omission. Requiring an individualized showing of the reliance element in a securities fraud class action would nearly always cause individualized issues to predominate over issues common to the class, thereby defeating any chance for class action. To avoid this result in such fraud cases, the Supreme Court has explicitly allowed a class to be certified based on a reasonable presumption of reliance. See Basic v. Levinson, 485 U.S. 224 (1988) (adopting fraud-on-the-market theory) (hereinafter "Basic presumption"). The Basic presumption is premised upon the fraud-on-the-market theory, which holds that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2417 (2014) ("Halliburton II"). Accordingly, "[t]o prove such indirect reliance [to receive the benefit of the Basic presumption], a plaintiff must show (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. At the class certification stage, however, no proof of materiality is required." Brown, 785 F.3d at 931 (citing Halliburton II, 134 S. Ct. at 2408 (internal quotation marks omitted)). Similarly, no proof of loss causation is required. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1192 (2013) (internal citation omitted). Accordingly, at this stage, a plaintiff need only demonstrate by a preponderance of the evidence that the alleged misrepresentations were publicly known and that the stock traded in an efficient market.

Defendants do not dispute that the alleged false statements were clearly in the public arena because the majority of these statements appeared in NII's SEC filings, in conference calls with analysts and investors, and in press releases. Pls.' Mem. at 16 (citing Compl. ¶¶ 53, 54, 56, 60,

65-67, 76, 77, 82, 83, 87-89, 92, 97, 99-101, 104, 105, 111-319). Accordingly, for Lead Plaintiffs to receive the benefit of the <u>Basic</u> presumption, all that remains for them to show at this stage is that the securities at issue traded in an efficient market.

In the Fourth Circuit, the standard for determining whether a security trades in an efficient market is determined by considering: "factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals. <u>See, e.g., Cammer v. Bloom</u>, 711 F.Supp. 1264, 1285-87 (D.N.J. 1989) (examining (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes)." <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 368 (4th Cir. 2004). The <u>Cammer</u> factors cited by the <u>Gariety</u> opinion are merely instructive in this inquiry. <u>Carpenters Pension Trust Fund of St. Louis v. Barclays PLC</u>, No. 12-CV-5329 SAS, 2015 WL 5000849, at *9 (S.D.N.Y. Aug. 20, 2015) (explaining that "the vast majority of courts have used the <u>Cammer</u> factors as an analytical tool rather than as a checklist" (internal quotation marks omitted)). Despite defendants' arguments to the contrary, in the Fourth Circuit, no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient. <u>Contra</u> Defs.' Opp'n at 10 (citing <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 207 (2d Cir. 2008)).

Although the showings to establish market efficiency for bond markets differs from the showing for stock exchanges, courts tend to employ the <u>Cammer</u> factors as an analytical tool when determining whether bonds traded in an efficient market. <u>See Bombardier Inc.</u>, 546 F.3d at 210; <u>In re DVI Inc. Sec. Litig.</u>, 249 F.R.D. 196, 214 (E.D. Pa. 2008) <u>aff'd sub nom. In re DVI, Inc. Sec.</u>

Litig., 639 F.3d 623 (3d Cir. 2011) (explaining that "the Court will take the same general approach for determining the market-efficiency of DVI's Senior Notes as with DVI common stock, bearing in mind [the] structural differences [between debt and equity securities markets]"); In re Safety-Kleen Corp. Bondholders Litig., No. 3:00-1145-17, 2004 WL 3115870, at *4 (D.S.C. Nov. 1, 2004). Because the Fourth Circuit has not offered a standard for determining market efficiency for bonds, Lead Plaintiffs also offered evidence on four additional factors to which the Fifth Circuit looks in this context; specifically, Lead Plaintiffs provided proof about NII's market capitalization; the bid-ask spread; the float, or issue amount outstanding excluding insider-owned securities; and the percentage of institutional ownership. In re HealthSouth Corp. Sec. Litig., 261 F.R.D. 616, 632 (N.D. Ala. 2009).

The Basic presumption is rebuttable at both the certification and merits stages. In Halliburton II, the Supreme Court held that a defendant could rebut a showing of market efficiency at the class certification stage by putting forth "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." Halliburton II, 134 S. Ct. at 2408 (internal citations and quotation marks omitted).

Relying on a report by their expert, Chad Coffman, who is an economist and Chartered Financial Analyst, Pls. Mem., Ex. H at 5 (hereinafter "Coffman Report"), Lead Plaintiffs base their showing of market efficiency for both the stocks and bonds on the Cammer factors, along with three additional factors suggested in Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001) (the

company's market capitalization; the bid-ask-spread; and the "float," or the percentage of securities not held by company insiders when engaging in a determination of market efficiency).

The first Cammer factor is average trading volume. Lead Plaintiffs point to NII common stock being listed and traded on NASDAQ throughout the class period, which weighs in favor of a finding of market efficiency. As Lead Plaintiffs argue, "most courts agree that [a] listing [on the NYSE or NASDAQ] is a good indicator of efficiency." Carpenters Pension, No. 2015 WL 5000849, at *7, *7 n.80 (collecting cases); Pls.' Mem. at 17. Defendants rightly point out that although this factor is probative of market efficiency, it is not dispositive. Defs.' Opp'n at 9 n.7 (collecting cases). Nevertheless, the volume of trading activity for both NII's stocks and bonds is a significant factor supporting a finding of an efficient market. During the class period, NII stocks averaged a daily trading volume of over 3.5 million shares, representing an average weekly turnover of 10.07%. Pls.' Mem. at 19. Similarly, the average weekly trading volume of NII bonds hovered around 2.94%. Id. These average weekly turnover percentages surpass the benchmark set down by Cammer of 2% for a "strong presumption" that the market was efficient. Cammer, 711 F. Supp. at 1286. Moreover, both types of securities were traded on a majority of possible trading days during the class period, which is probative of high trading frequency and investor interest. Pls.' Mem. at 19 (citing Coffman Report ¶ 105). Accordingly, although the showing on this factor alone does not carry the day, it is strongly suggestive that NII stocks and bonds traded in an efficient market.

The second Cammer factor is the number of securities analysts following the security because that fact "permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 446 (S.D.N.Y.

2013). Lead Plaintiffs point to the existence of at least 528 reports about NII during the class period, which were published by 18 firms, including major banks like Credit Suisse, J.P. Morgan, and Morgan Stanley. Pls.' Mem. at 20. As Lead Plaintiffs correctly argue, this showing demonstrates that there was "an active market for information regarding the company and its securities, and that [such] information was widely distributed." Id. (citing Coffman Report ¶¶ 34-39, Ex. H). As such, this factor weighs in favor of a finding of market efficiency with regard to both NII common stock and bonds.

The third Cammer factor is the extent to which market makers and arbitrageurs trade in the stock. As the Southern District of New York explains, "market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." Winstar, 290 F.R.D. at 446. Under SEC regulations, a market maker is

> [A] dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3-1(c)(8). Essentially, the existence of market makers indicates that a security is liquid and that relevant information is disseminated and appropriately assimilated into the price, particularly when analyzing securities traded in over-the-counter markets. See Cammer, 711 F. Supp. at 1283. Given that NII common stocks were traded on NASDAQ, a market with continuous public price and volume reporting, Pls.' Mem. at 20-21, and NII's listing of those stocks remained in good standing throughout the class period with regard to reporting requirements, this factor further supports a showing of market efficiency for NII common stock because the NII's stock were continuously listed on NASDAQ throughout the class period. This listing alleviates any concern that market makers might otherwise remediate for securities listed on over-the-counter markets with regard to their liquidity and information dissemination. In terms of the NII bonds,

Lead Plaintiffs have demonstrated market efficiency by pointing to over 100 separately identifiable market participants who traded in NII bonds during the class period. Id. at 21 (citing Coffman Report ¶ 111). Accordingly, this factor contributes to a finding of market efficiency for NII common stock as well as for NII bonds.

The fourth Cammer factor requires a relatively straight-forward determination—whether the company was eligible to file an SEC Form S–3 registration statement. As the First Circuit summarized, "[c]ompanies permitted by the SEC to file an S–3 Registration Statement, an abbreviated prospectus requiring fewer disclosures than Forms S–1 or S–2, are those which meet the $75 million market capitalization requirement and have filed reports with the SEC for twelve consecutive months." In re Xcelera.com Sec. Litig., 430 F.3d 503, 517 n.9 (1st Cir. 2005) (summarizing the core requirements set down in 17 C.F.R. § 239.13 (2003)). This status is relevant to the inquiry because "Form S–3 is reserved for companies whose stock is actively traded and widely followed." Unger v. Amedisys Inc., 401 F.3d 316, 326 n.5 (5th Cir. 2005). In other words, when an issuer of securities meets Form S–3's requirements, the market for its securities is likely one that quickly assimilates material public information into the price because the market is well developed and trading is robust. There is no dispute that NII was S–3 eligible and filed Forms S–3 during and surrounding the class period. Pls.' Mem. at 22 (citing Compl. ¶ 353; Answer ¶ 353). This Cammer factor accordingly weighs in favor of a finding that the market for NII common stock was efficient.

The fifth and final Cammer factor focuses on empirical evidence that demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer, 711 F. Supp. at 1286-87. This is the Cammer factor that defendants vigorously dispute. Lead Plaintiffs attempt to satisfy this factor with an

event study conducted by their expert, Coffman, in which he applied regression analyses to determine the relationship between the price of the relevant security and broader market factors. Specifically, he compared the price fluctuation of NII common stock and bonds on days with earnings announcements with their price movement on days with minimal or no news related to NII. Pls.' Mem. at 22. The analyses, which Coffman ran for each event day, controlled for several variables such as the S&P 500 Total Return Index, the BNY Mellon Latin America ADR Index, and a weighted index of peer firms that could otherwise explain price fluctuations. Coffman Report ¶ 51. These analyses indicated a positive correlation between changes in NII stock prices and control variables. Id. ¶ 58.

After adjusting for the price impact borne out by the regression, Coffman found that quarterly earnings announcements resulted in statistically significant price movements at the 95% confidence level for 12 of the 18 event days he analyzed. Id. ¶ 62. In contrast, for 162 days with no earnings announcements, Coffman found 14 statistically significant price movements. Id. A finding supporting a price reaction on 66.7% of earnings announcement days is greater than several findings deemed sufficient by other district courts. See Petrie v. Elec. Game Card, Inc., 308 F.R.D. 336, 354 (C.D. Cal. 2015) (certifying class because of strong showing on other Cammer factors, even though expert only found statistically significant price movement on 8 of 50 days); Carpenters Pension, 2015 WL 5000849, at *17 (finding market efficiency based on an event study demonstrating price reaction on 5 out of 15 event days, but noting that the court would have found efficiency regardless of the fifth Cammer factor showing).

For NII bonds, Coffman found that bonds reacted to bond-value-relevant news. Pls.' Mem. at 24 (citing Coffman Report ¶ 122). Specifically, the 10% Notes displayed a statistically significant reaction for 7 of 16 earning announcement days (43.75%), whereas there was

statistically significant movement on 8.97% of non-news days. Id. (citing Coffman Report ¶ 118). The 8.875% Note and the 7.625% Note displayed similar reactions. Id. Moreover, Coffman's report demonstrated that trading volume of all three types of bonds responded in a statistically significant manner to earnings announcements and other NII news. Id.

Defendants attempt to defeat Lead Plaintiffs' claim that the market was efficient by attacking Coffman's methodology and conclusions. To do this, they rely on a report produced by their expert, Paul A. Gompers, a Professor of Business Administration at Harvard, Defs.' Opp'n, Ex. A (hereinafter "Gompers Report"). First, defendants argue that Coffman's conclusions are unfounded because he failed to analyze whether the news released on the 18 event days was new or unexpected. Defs.' Opp'n at 13. Lead Plaintiffs persuasively rebut this attack, arguing that Coffman's study avoids bias by using objective measures of event days, namely those days on which NII earnings announcements were made. Pls.' Reply Mem. in Supp. at 11 [Dkt. No. 220], Oct. 28, 2015 ("Pls.' Reply"). Indeed, an expert report relying on a study containing cherry-picked event dates is far less persuasive than one in which objective criteria were used. See, e.g., In re PolyMedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (finding an expert's "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing").

Defendants next contend that Coffman's analysis is flawed because he failed to analyze whether price reactions were consistent with the nature of the news released in the earnings reports. Defs.' Opp'n at 14. The record shows that one of the event days on which Coffman found statistically significant price movement should be discounted because the movement was inconsistent with the nature of the news released. Id. Specifically, the NII earnings announcement on April 26, 2012 exceeded consensus expectations, yet the stock price exhibited a statistically

significant decrease of 23.58%. Gompers Report ¶ 37. This correction reduces the statistically

significant price impact to 61.1% of the time rather than 67.7% of the time, a negligible reduction

and hardly determinative of the outcome of this inquiry. In addition, defendants' contention that

Coffman's study is flawed because he failed to adjust his results for the Holm-Bonferroni[1]

correction is misplaced because of the relatively small sample size here. Id. at 15; Pls.' Reply at 13.

Moreover, study results with a confidence interval of 99% are not required to show price impact in

this context. Pls.' Reply at 13 (citing Coffman Rebuttal ¶¶ 46-52). Even if Lead Plaintiffs' event

study were considered less than robust, defendants' critiques do not successfully rebut Lead

Plaintiffs' showing on the fifth Cammer factor, nor are they dispositive of the market efficiency

inquiry.

In addition to the Cammer factors, Lead Plaintiffs put forth evidence of three additional

factors that support a finding of market efficiency suggested by Krogman v. Sterritt, 202 F.R.D.

467 (N.D. Tex. 2001). First, Lead Plaintiffs point to NII's market capitalization, which was higher

than the majority of firms offering NASDAQ-traded stocks during the class period. Pls.' Mem. at

25. Specifically, between 166 million and 173 million shares of NII stock were outstanding during

the class period, the market price of which denotes an average market capitalization of $3.73

billion. Id. Likewise, as of December 5, 2011, more than $1.45 billion in NII bonds were

outstanding, which also supports the conclusion that their market was efficient. Id. at 25-26.

Similarly, the monthly bid-ask spread for NII stocks during the class period ranged from

0.5 cents to 2 cents, meaning the weighted average spread was only 0.106%. Id. "The bid-ask

spread is the difference between the price at which investors are willing to buy the stock and the

---

[1] This is a statistical method for correcting the error rates involved in multiple comparisons and to
counteract the problem of false positives. Sture Holm, A Simple Sequentially Rejective Multiple
Test Procedure, 6 Scand. J. Statist. 65 (1978), available at http://www.jstor.org/stable/4615733.

price at which current stockholders are willing to sell their shares." Krogman, 202 F.R.D. at 478. A narrow bid-ask spread indicates the presence of an efficient market because it suggests that the stock is liquid and more likely to be traded. Id. According to Coffman, NII's weighted average placed NII stocks within the 42nd percentile of 100 other randomly sampled securities traded on the NYSE and NASDAQ. Id. (citing Coffman Report ¶ 72). This spread is narrower than those that other courts have found to weigh in favor of finding market efficiency. See, e.g., Cheney v. Cyberguard Corp., 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding that 2.44% average daily relative bid-ask spread was suggestive of market efficiency). Accordingly, this Court finds this factor weighs in support of a finding of market efficiency.

Lead Plaintiffs next raise the factor of the percentage of securities owned by outsiders, including institutions. "This percentage, known as the 'float,' is helpful regarding market efficiency as insiders may have information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information. Accordingly, a high percentage of insiders holding stock and a relatively low float weigh against a finding of market efficiency." Cheney, 213 F.R.D. at 502 (internal quotation marks and citations omitted). Lead Plaintiffs highlight NII's strong public float of 98.9%, which means that insiders held only 1.1% of outstanding shares. Pls.' Mem. at 27. Institutional ownership of NII stock was also robust; institutions held an average of 95.03% of the public float at the end of each quarter during the class period. Id. NII bonds also displayed a public float suggestive of market efficiency. An average of approximately 50% of NII bonds were held by institutions during the class period. Accordingly, the public floats of both NII stocks and bonds support a finding of market efficiency.

Despite defendants' vigorous attacks on Coffman's findings and on Lead Plaintiffs'

arguments as to market efficiency, they neither rebut Coffman's findings nor offer any evidence to demonstrate that the market was not efficient. Accordingly, even if the fifth <u>Cammer</u> factor were considered weak, the evidence offered in support of the other <u>Cammer</u> factors as well as the non-<u>Cammer</u> factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market. As such, Lead Plaintiffs are entitled to the <u>Basic</u> presumption and, at this stage, need not make individualized showings of reliance. Furthermore, as a result, the element of reliance poses no obstacle to the finding of predominance required for class certification.

The final issue within the predominance inquiry is the damages element. Lead Plaintiffs argue that classwide damages are subject to a common methodology that does not scuttle predominance. Pls.' Mem. at 29. Specifically, they point to the standard formula for assessing damages under Rule 10b-5, which is the artificial inflation at the time of purchase reduced by the artificial inflation at the time of sale if the security was sold before the fraud was revealed, or otherwise merely the artificial inflation at the time of purchase. Coffman Report ¶¶ 138-39. Despite the defendants' arguments to the contrary, <u>Comcast</u> merely held that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1433 (2013). Moreover, the Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage.

Lead Plaintiffs provide adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day. Coffman Report ¶¶ 138, 139. The method offered by Lead Plaintiffs is widely accepted as the traditional measure of

damages for Rule 10b-5 actions. See, e.g., Affiliated Ute Citizens of Utah v. United States, 406

U.S. 128, 155 (1972) ("In our view, the correct measure of damages . . . is the difference between

the fair value of all that the mixed-blood seller received and the fair value of what he would have

received had there been no fraudulent conduct."). There is no convincing demonstration by the

defendants that this damages theory does not closely hew to Lead Plaintiffs' theory of liability or

that such a theory could not be applied class-wide. Accordingly, Lead Plaintiffs' damages model

supports a finding of predominance.

> 2. Superiority

Finally, the Court finds that litigation through "class action is superior to other available

methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), with

reference to:

> (A) the class members' interests in individually controlling the prosecution or defense of
> separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or
> against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the
> particular forum; and
> (D) the likely difficulties in managing a class action

Id.

Lead Plaintiffs correctly argue that class members have a limited interest in asserting

individual claims because they are geographically dispersed and their damages claims have a

negative value insofar as they would be uneconomical to assert individually. Pls.' Mem. at 29.

Class treatment is the superior method for resolving this action because it would alleviate those

problems, allowing the pooling of damages claims so as to make prosecution of the action

economically rational. Id. at 30. Further, Lead Plaintiffs submit that they are unaware of any

pending litigation in the United States putting forth similar allegations aside from those already

consolidated within the pending action. Id. Relatedly, Lead Plaintiffs contend that class treatment

would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system. Id. Finally, Lead Plaintiffs highlight that federal securities fraud cases are routinely certified and present no unusual issues of manageability. Id. (citing In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 544 (E.D. Va. 2006)).

### III. Conclusion

For all of the above-stated reasons, Lead Plaintiffs have demonstrated that they satisfy the requirements of Fed. R. Civ. P. 23(a) and (b) by a preponderance of the evidence and their Motion for Class Certification and Appointment of Class Representatives and Class Counsel [Dkt. No. 199] will be granted in an appropriate Order to be issued with this Memorandum Opinion.

Entered this 17 day of November, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge